IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2024

# IN RE JAYLYNN J.

**Appeal from the Juvenile Court for Davidson County**
**No. PT272009    Sheila Calloway, Judge**

_____

**No. M2023-01496-COA-R3-PT**

_____

This appeal involves the termination of parental rights of a mother. The juvenile court found by clear and convincing evidence that five grounds for termination were proven and that termination was in the best interest of the child. The mother appeals. On appeal, DCS maintains that four grounds for termination were sufficiently proven against the mother. We vacate one ground due to insufficient findings by the trial court. We conclude that the three other remaining grounds for termination were sufficiently proven, but due to insufficient findings in the termination order, we vacate the court's determination that termination of the mother's parental rights was in the best interest of the child and remand for the court to consider all of the relevant best interest factors and detail its findings. Accordingly, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Heather F.

Jonathan Skrmetti, Attorney General and Reporter, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

This appeal arises from a petition to terminate the parental rights of Heather F.[1] ("Mother") to her daughter, Jaylynn J.[2] ("the Child"). The Tennessee Department of Children's Services ("DCS") became involved with the family in April 2020. DCS received a referral alleging that the family appeared to be using and dealing drugs. A child protective services assessor (CPSA) investigated the referral, and DCS determined that Mother's substance abuse posed a risk to the safety of her two-year-old child. The CPSA explained to Mother that a safety plan would need to be utilized to ensure the safety of the Child while Mother addressed her substance abuse issues. Mother suggested that the Child's great-aunt and great-uncle would be willing to take care of her. DCS subsequently placed the Child with these relatives pursuant to an immediate protection agreement (IPA) while Mother attempted to address her substance abuse issues. The juvenile court subsequently entered an order restricting Mother's contact with the Child to supervised visitation with no overnight visits. In June 2020, the CPSA spoke with Mother, and she admitted to using heroin recently. Due to concerns with Mother's continued drug use, DCS further limited Mother's visits with the Child to phone calls and FaceTime. In June 2020, DCS filed an amended petition[3] to adjudicate dependency and neglect, requesting court-ordered services and a restraining order. The juvenile court held a hearing on this petition in August 2020. At the hearing, Mother and the Child's father stipulated to dependency and neglect and agreed that custody of the Child be placed with the Child's great-aunt.[4]

After the hearing, the great-aunt told DCS that she would no longer be able to care for the Child, and she was placed with another family pursuant to an IPA. In September 2020, an individual from the second family informed DCS that she could no longer take care of the Child due to health concerns. DCS subsequently convened a team meeting to discuss potential placements for the Child. After completing background checks for potential homes, it was determined that the proposed individuals could not be approved by DCS. Additionally, results from a drug screen showed that Mother was positive for morphine in August 2020. DCS was also concerned about the lack of medical care for the Child, as she was behind on her immunizations, was underweight at the time of the initial IPA placement, and was diagnosed with a digestive issue and a hernia. Due to these concerns, the Child was removed to DCS custody in September 2020. DCS subsequently filed a petition for custody in the juvenile court, requesting, among other things, that the court award temporary legal custody of the Child to DCS and declare the Child dependent and neglected.[5] On that same day, the juvenile court entered an emergency protective

---

[1] In order to the protect the privacy of the children involved, it is this Court's policy to use the first names and initials of the parties and children.

[2] The Child was born in January 2018.

[3] The original dependency and neglect petition is absent from the record on appeal.

[4] The court entered its written order of adjudication and disposition in February 2021.

[5] DCS filed this petition for custody under a different docket number than the number listed on the amended dependency and neglect petition.

custody order awarding "temporary care and custody" of the Child to DCS.

In October 2020, DCS developed the first permanency plan. This permanency plan contained a statement of responsibilities for Mother, which required her to complete an alcohol and drug ("A&D") assessment and follow all recommendations, sign a release of information to DCS, and submit to random drug screens. The plan additionally required Mother to obtain and maintain housing, provide proof of housing and income, and notify the department within ten days if there were any changes. Mother was also required to complete a parenting assessment, follow all recommendations from the parenting assessment, and sign a release of information to DCS. To maintain a bonded relationship between Mother and the Child, the permanency plan also required Mother to attend at least two supervised visits a month for a total of four hours a month.

In August 2021, DCS developed a revised permanency plan with substantially the same responsibilities. The statement of responsibilities additionally required Mother to seek proper employment to provide for the Child. This plan stated that "DCS will provide [Mother] with a list of agencies [where] she can complete Parenting Classes . . . ." Additionally, the responsibility concerning visitation was revised to require Mother to "maintain visitation with Jaylynn."

The final permanency plan was developed by DCS in December 2021. This plan again required Mother to obtain and maintain housing, provide proof of housing and income, and notify DCS within ten days of any changes. The statement of responsibilities additionally stated that "[Mother] has no [sic] provided DCS with proof of housing stability." The plan further required Mother to complete a parenting assessment, follow all recommendations from the parenting assessment, and sign a release of information to DCS. However, concerning her drug use, under the heading for responsibilities, the plan simply stated that "[Mother] has not completed an A&D assessment." The sections on employment and visitation also were changed to state that "Mother has not provided DCS with employment information[,]" and that "Mother is not consistent with visiting her daughter." In June 2022, Mother began a lengthy period of incarceration.

In September 2022, DCS filed a petition in the juvenile court to terminate Mother's parental rights to the Child, alleging the following grounds: (1) abandonment by an incarcerated parent; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with a permanency plan; (4) persistent conditions; and (5) failure to manifest an ability and willingness to assume custody or financial responsibility.[6] DCS further alleged that it was in the best interest of the Child for Mother's parental rights to be terminated. The petition was heard in April 2023. Several witnesses testified, including Mother; the foster mother; Ms. Latrecia Morris-Clay, a case worker from DCS; and the

---

[6] The petition also concerned the parental rights of the Child's father. The trial court ultimately ordered that the father's parental rights be terminated. The father did not appeal.

maternal grandmother.

The court first heard testimony from Mother. Mother testified that she was incarcerated in June 2022 and remained in jail until February 2023. Her incarceration resulted from an arrest after a dispute with her neighbors, and she incurred a burglary charge and two assault charges. She pled guilty to the two assault charges and to a theft charge after the burglary charge was "dropped down." She was placed on two years' probation and was required to complete a thirty-day drug rehabilitation program. After completing the program, she began a six-month program at a halfway house a few weeks before trial, in March 2023.

Regarding her housing situation, Mother testified that she was living with her grandmother and mother when the Child entered foster care. She continued to reside there until her incarceration in June 2022. Mother described this home as a "good environment," but she admitted that this home was not suitable for the Child because she was actively using drugs while she was there. She immediately went to the drug rehabilitation program after she was released from jail, and she remained in the program for thirty-five days. After completing this program, she moved to a halfway house, where she resided at the time of trial. She stated that the Child would not be able to live with her at the halfway house, but she believed that completing the program would give her time to save up to get an apartment and have a place to live. However, she admitted that she did not have any "concrete plans" for where she would live after leaving the halfway house.

Mother also testified concerning her history of drug use. She admitted that when the Child was removed from her home, she had only been an active drug user for a couple of months, and the primary drug that she used was heroin. Mother also testified concerning the random drug screens she completed with DCS. She admitted that she was never "clean" on a DCS drug screen. In April 2020, she tested positive for Xanax and heroin. In November 2021, she tested positive for THC. She completed another drug screen during a visit with the Child in March 2022, and she tested positive for cocaine, methamphetamine, opiates, and THC. She further testified that she had entered a substance abuse treatment program three times, and she completed a detox program. After the detox program, it was recommended that she complete a thirty-day substance abuse inpatient treatment program. However, Mother stated that before she entered jail, she never completed an alcohol and drug program successfully. After leaving jail, she completed a required thirty-day drug rehabilitation program as required for her probation. According to Mother, being in jail enabled her to take her sobriety seriously because it "gave [her] time to actually sit down and think about it and to get in a better head space than what [she] was at." She further explained that she needed that time without contact with the outside world to become sober. When questioned about her plan for maintaining sobriety in "the real world," Mother testified that her plan was to use the tools that she learned in the halfway house and AA and NA meetings. Mother further testified that two or three days before trial, she completed a drug screen and was "clean."

- 4 -

Mother testified that she was aware that she had a permanency plan with responsibilities that she needed to complete. She admitted that she did not make progress on any of the responsibilities until she went to jail and then started the halfway house program. As for obtaining a legal source of income, Mother testified that by the time of trial, she began a "transitional job" through a program called "Project Return" that could potentially become a permanent job. She explained that this was her first job since the Child entered foster care. She later clarified, however, that she had employment "on and off," but none of her jobs lasted due to her drug use and failure to go to work. She further attributed her former lack of employment to depression resulting from losing custody of the Child. Mother admitted that she did not complete a parenting assessment. Regarding visitation, Mother explained that although she visited the Child often at the beginning of the case, after the Child entered the second foster home, visitation became less frequent, and she had "more phone visits than anything" due to COVID restrictions. She further explained that after the Child was placed with the current foster parents in "the first part of 2021," she had difficulty communicating with the DCS case worker to schedule visitation. Mother also attributed her lack of visitation to problems with the DCS case worker not showing up for visits or cancelling visits. She testified, however, that before she was incarcerated, she had visits in February and March 2022.

The court next heard testimony from the foster mother. The foster mother testified about the Child's time in her home, where she had lived since March 2021. When she arrived at the foster mother's home, she was three years old. The foster mother explained that the Child had separation anxiety and exhibited many behavioral issues at first, including temper tantrums, spitting, biting, and getting easily angered. She was initially delayed in potty training, but she became potty trained after sixteen months in the foster mother's home. She would also sometimes scream when sleeping due to night terrors, but these night terrors had occurred less frequently since she had been in the foster home. Soon after entering the foster mother's care, the Child started behavioral therapy. The foster mother stated that the therapy was very successful and the Child became less frustrated, more able to articulate her thoughts, and more "secure in herself." She was also in speech therapy due to a "tongue tie," and she made progress in her speech as a result. The foster mother observed that since the Child had moved into the home, her behavior had become "more in line with a normal child of five years old."

The foster mother also testified that she and her husband wanted to adopt the Child if possible. According to the foster mother, the Child referred to her and her husband as "Mama" and "Daddy." She also observed that her children love the Child and that they treat her as a sibling. The foster mother ultimately opined that adoption would be in the Child's best interest because she thrives in the structure of her home and feels secure.

The court also heard testimony from Ms. Morris-Clay, the active case manager who first took over the case in March 2023. She explained that before taking over the case, she

had also supervised the case for twenty-one months prior. She testified that when she first took over the case, she knew that Mother had been in jail. However, she did not check to see if Mother was still incarcerated, and she first learned the week before trial that Mother had been released from jail. Ms. Morris-Clay also testified concerning Mother's drug use. She explained that Mother missed scheduled drug screens in January and February 2021, and she read from a DCS report stating that a family services worker advised Mother that not showing up for a drug screen counted as a positive screen. However, she did not know if DCS attempted to schedule any other drug screens after March 2022. She further testified that since she took over the case in March 2023, she attempted to contact Mother to schedule a random drug screen, but she was unable to get into contact with her.

Ms. Morris-Clay testified that prior to Mother's incarceration in June 2022, she did not comply with the responsibilities in the permanency plans. She stated that Mother did not "complete services" and that she continued to test positive for illicit substances. She further stated that Mother did not contact DCS to report that she was out of jail and that she was completing a substance abuse program. She testified that Mother did not complete an A&D assessment and follow the recommendations, did not complete a parenting assessment and follow the recommendations, did not obtain stable housing, did not have a legal source of income, did not participate in regular visitation, and did not pay child support. She recalled that Mother visited the Child in March 2022, but before this date, she had missed multiple scheduled visits. She also explained that DCS would not approve Mother's housing situation with her mother and grandmother because there were concerns about substance abuse in the home.

In June 2023, the trial court entered an order finding that the following grounds existed to terminate Mother's parental rights: (1) abandonment by an incarcerated parent; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with a permanency plan; (4) persistent conditions; and (5) failure to manifest an ability and willingness to assume legal or physical custody of the Child. The court also found that termination of Mother's parental rights was in the best interest of the Child. In August 2023, Mother filed a motion pursuant to Tennessee Rule of Civil Procedure 60.02 requesting that the court re-enter its termination order to allow her to file a timely notice of appeal. The court granted this motion and entered an amended termination order in September 2023, changing only the date that the order was filed.[7] Mother thereafter filed a timely notice of appeal.

## II.  ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

---

[7] DCS does not raise any issue on appeal regarding the trial court's decision to grant the Rule 60 motion.

1. Whether the trial court erred when it found by clear and convincing evidence that the ground of abandonment by an incarcerated parent existed as to the mother;

2. Whether the trial court erred when it found by clear and convincing evidence that the ground of abandonment by failure to establish a suitable home existed as to the mother;

3. Whether the trial court erred when it found by clear and convincing evidence that the ground of substantial noncompliance with a permanency plan existed as to the mother;

4. Whether the trial court erred when it found by clear and convincing evidence that the ground of persistent conditions existed as to the mother;

5. Whether the trial court erred when it found by clear and convincing evidence that the ground of failure to manifest an ability and willingness to assume custody or financial responsibility existed as to the mother;

6. Whether the trial court erred when it found that termination of the mother's parental rights was in the best interest of the child.

For the following reasons, we affirm in part, reverse in part, and vacate in part the decision of the juvenile court and remand for further proceedings.

### III.    STANDARDS APPLICABLE TO TERMINATION CASES

One of the most serious decisions courts are called upon to make is the termination of a parent's rights to his or her child. *In re Mariah K.D.*, No. M2011-02655-COA-R3-PT, 2012 WL 3090313, at *6 (Tenn. Ct. App. July 30, 2012). The decision to terminate a parent's rights to his or her child "has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or the guardian of the child." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing Tenn. Code Ann. § 36-1-113(l)). Accordingly, "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) (citing Tenn. Code Ann. § 36-1-113(l)). "A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (citing *In re Carrington H.*, 483 S.W.3d at 521). Despite being fundamental and constitutionally protected, however, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522 (citing *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010)).

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination as provided in section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest of the child under the factors set forth in section 36-1-113(i). *Id.* Due to the constitutional

dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). It also "eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Due to the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure and presume each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION
### A. Grounds for Termination

As previously discussed, the trial court found that the following grounds existed to terminate Mother's parental rights: (1) abandonment by an incarcerated parent; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with a permanency plan; (4) persistent conditions; and (5) failure to manifest an ability and willingness to assume custody or financial responsibility of the child. We note, however, that DCS states in its brief on appeal that it "does not defend the ground of abandonment by an incarcerated parent . . . ." We therefore reverse the trial court's findings as to this ground. *See In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *12 (Tenn. Ct. App. Dec. 22, 2020); *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *6 (Tenn. Ct. App. Oct. 29, 2018) ("[W]hen the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established."); *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) (reversing a ground that DCS "does not defend" and noting that *Carrington* "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal"). DCS defends only the grounds of

abandonment by failure to establish a suitable home, substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility of the Child. We therefore proceed to consider whether the trial court erred in finding that these grounds existed to terminate Mother's parental rights.

### 1. Substantial Noncompliance with a Permanency Plan

The first ground at issue on appeal is substantial noncompliance with a permanency plan. Permanency plans "are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care." *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). "This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children." *Id.* Therefore, a ground for termination exists when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). For this ground, the permanency plan responsibilities must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)). Conditions that necessitated foster care may "include conditions related both to the child's removal and to family reunification." *Id.* "Not every failure to comply with a permanency plan will constitute grounds for termination of parental rights." *In re Jaylan J.*, 2020 WL 7861378, at *14 (citing *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *14 (Tenn. Ct. App. Sept. 14, 2012)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). The Tennessee Supreme Court has described this ground as follows:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d at 548-49.

As previously discussed, three permanency plans were created for Mother. We find the responsibilities in these plans to be reasonable and related to remedying the conditions that necessitated foster care placement. Many of the responsibilities in the plans were related to remedying Mother's drug use, which led to the Child's initial removal from her home. The responsibilities relating to Mother's housing, parenting, employment, income, and visitation were related to the goal of family reunification.

We first consider Mother's compliance with the responsibilities regarding drug use. The first and second permanency plans required Mother to complete an A&D assessment and follow all recommendations, sign a release of information to DCS, and submit to random drug screens. The third permanency plan simply stated that "Mother has not completed an A&D assessment." Ms. Morris-Clay testified that Mother did not complete an A&D assessment. However, Mother testified that she completed three A&D assessments during her time in separate treatment facilities. Mother also testified that after completing the assessments, it was recommended that she complete an inpatient treatment program. She did not complete an inpatient program, however, until after she entered a plea agreement related to her criminal charges. Likewise, Mother testified that she signed a release of information for both of her stints in the drug treatment program. Although Mother also submitted to a number of drug screens in this case, she also missed four random drug screens in January and February 2021. In sum, due to the competing testimony on the issue, it is unclear whether Mother completed an A&D assessment. Although it is likewise unclear whether such assessments recommended an inpatient treatment program, she ultimately completed an inpatient substance abuse treatment program after leaving jail. Overall, however, Mother partially complied with the requirements concerning her drug use.

The first permanency plan, developed by DCS in October 2020, required Mother to attend at least two supervised visits a month for a total of four hours a month. Mother testified that she visited frequently when the Child was in the home of her great-aunt and after the Child was removed to DCS custody in September 2020, but after "the first part of 2021" she did not visit frequently. In December 2020, DCS began offering her biweekly time windows for phone visitation, but Mother did not call during thirteen of these biweekly periods in January and February 2021. In August 2021, DCS developed the second permanency plan, which required Mother to "maintain visitation with Jaylynn." After the second permanency plan was developed, Mother did not attend a scheduled in-person visit in September 2021, and there were no other records about her visitation during this period. In December 2021, DCS developed the third permanency plan, which simply read that Mother was "not consistent with visiting her daughter." Mother testified that she attended an in-person visit in February 2022, and she and the foster mother both testified that she attended visitation in March 2022. However, Ms. Morris-Clay and the foster mother testified that Mother did not attend a scheduled in-person visit in February 2022. Mother's last visit before her incarceration was in March 2022, and she did not visit the Child after she was released from incarceration. In sum, although Mother regularly visited

at the beginning of the case, she did not maintain her effort to maintain visitation with the Child. Thus, Mother only partially complied with the responsibilities related to visitation.

Regarding Mother's income and employment, all three permanency plans required her to provide DCS with proof of income. The second permanency plan additionally required her to "seek proper employment to provide for [the Child]." After the Child was removed from her home, Mother quit her full-time job. After leaving this job, she had employment "on and off," but none of her jobs lasted due to her drug use and failure to go to work. By the time of trial, Mother had a "transitional job," which she started twelve days before trial. Mother did not, however, provide proof of income to DCS. Overall, although Mother obtained employment twelve days before trial, she did not comply with the responsibilities concerning proof of income.

The first and third permanency plans required Mother to complete a parenting assessment and follow all recommendations and sign a release of information to DCS. However, the responsibilities section of the second plan simply stated that DCS would provide her with a list of agencies with whom she could complete parenting classes. Mother admitted at trial that she did not complete a parenting assessment. Thus, Mother did not comply with the responsibilities related to a parenting assessment.

The statement of responsibilities for the first and third permanency plans required Mother to obtain and maintain housing, provide proof of housing, and "notify the department within [ten] days if anything changes." The second permanency plans also required Mother to obtain and maintain housing and provide proof of housing, but this plan clarified that Mother was required to notify DCS within ten days if there were any changes to her "employment, residence, or contact information." As previously discussed, Mother resided with her grandmother and mother until her incarceration in June 2022. After she left jail in February 2023, Mother entered a substance abuse treatment program, and by the time of trial, she resided at a halfway house. However, from our review of the record, it does not appear that Mother notified DCS of any changes to her housing situation, contact information, or income. Ms. Morris-Clay testified that she was not aware that Mother had been released from jail until the week before trial. Likewise, Mother did not regularly provide DCS with updated contact information. She had more than five different phone numbers since the Child entered foster care, and DCS sometimes had trouble contacting her. Therefore, Mother partially complied with the responsibilities pertaining to housing.

Overall, while we recognize that Mother made some efforts to partially comply with the responsibilities related to her drug use, visitation, and housing, we note that she did not comply with many important responsibilities in the permanency plans.[8] Most notably, she

---

[8] In its appellate brief, DCS argues that Mother was substantially noncompliant due in part to her failure to pay child support. However, payment of child support was not expressly included in the *statement of responsibilities* in the three permanency plans. By failing to include this responsibility in the designated

- 11 -

did not complete a parenting assessment, did not provide proof of income to DCS, and did not maintain visitation after the Child entered DCS custody. We assign great weight to these responsibilities and find Mother's noncompliance with them to be substantial. Maintaining visitation throughout the Child's placement in foster care was necessary to ensure that Mother maintained a strong bond with the young child. Likewise, parenting classes and proof of income were necessary to ensure that Mother would be able to properly care for her. Mother's efforts were simply lacking with respect to these responsibilities. Therefore, we conclude that there is clear and convincing evidence supporting this ground for termination.

## 2. Persistent Conditions

The next ground for termination at issue is commonly referred to as "persistent conditions" or "persistence of conditions." This ground applies when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3). "A finding on the ground of persistence of conditions

---

"Statement of Responsibilities," DCS did not clearly communicate by the permanency plan that Mother must pay child support. *See In re Jaylan J.*, 2020 WL 7861378, at *20. Thus, in analyzing this ground, we do not consider whether Mother paid child support to determine she was in substantial noncompliance "with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2).

is not appropriate unless DCS presents clear and convincing evidence to establish each statutory element." *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009) (citing *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006)). The purpose behind the ground of persistent conditions "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). While the parents' efforts "are part of our analysis on substantial noncompliance with the permanency plan, the ground of persistent conditions focuses on whether the parent's efforts have been fruitful, i.e., whether the parent has remedied the conditions that led to the child's removal or whether those conditions will be remedied at an early date in the near future." *In re Abigail F.K.*, 2012 WL 4038526, at *20 (quotation omitted). "This ground for termination focuses on the *results* of the parent's efforts at improvement rather than the mere fact that he or she has made them." *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *17 (Tenn. Ct. App. Nov. 6, 2020) (citing *In re Abigail F.K.*, 2012 WL 4038526, at *20).

By the time DCS filed its amended petition to adjudicate dependency and neglect in June 2020, the Child was not in the home or physical custody of Mother because she was in the care of her great-aunt and great-uncle pursuant to an IPA. Therefore, in order for this ground to apply, the Child must have been removed from Mother's *legal custody* by "a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A); *see also In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *10 (Tenn. Ct. App. Mar. 8, 2023).

As previously discussed, in June 2020, DCS filed an amended petition in the juvenile court alleging that the Child was dependent and neglected. Based on the stipulations at the hearing in August 2020, the court entered a written order placing legal custody of the Child with her great-aunt and removing legal custody from Mother, but the written order was not entered until February 2021. Due to the delay in the entry of this written order, however, the juvenile court had, in the meantime, entered a protective custody order in the second dependency and neglect proceeding, in September 2020, granting temporary legal custody to DCS.[9] Because the written order from the first proceeding had not yet been entered, the custody order in the second proceeding is the one that effectively removed legal custody from Mother and placed it with DCS.

When the trial began in April 2023, more than two years had passed from the time the Child was removed from Mother's legal custody, which well exceeded the necessary period of six months for this ground. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B). Therefore, we determine that the requirement of the order of removal has been satisfied for

---

[9] It is not clear from the record why two separate dependency and neglect proceedings were filed in the juvenile court.

this ground.

The Child was removed from Mother's legal custody due to substance abuse issues. After the removal, Mother tested positive on several drug screens, and she admitted at trial that she was still using drugs until a month before she went to jail in June 2022. We recognize that Mother has made progress on her sobriety by refraining from drug use since she was incarcerated, and we commend her for it. However, Mother attributed her new-found sobriety to her time in jail, the substance abuse treatment program, and the halfway house, where she was restricted from "the outside world." For this reason, we question whether Mother's progress "would be lasting outside of the 'controlled environment'" of the jail, inpatient treatment, and the halfway house. *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *8 (Tenn. Ct. App. Aug. 15, 2023); *see also In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *13 (Tenn. Ct. App. July 6, 2021) ("While Mother's efforts to maintain her sobriety are commendable, she has not exhibited an ability to refrain from drug use for a prolonged period of time outside of a controlled environment . . . ."). Mother previously attempted substance abuse treatment after the Child entered DCS custody, and she completed a seven-day detox program. However, she resumed using drugs after completing the program and tested positive for drugs as late as March 2022. Because Mother has a history of returning to drugs after receiving treatment, her sobriety after her release from incarceration and completion of the inpatient treatment program "does little to persuade us that she will continue her efforts in the future, in light of her previous treatment and relapse." *In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *15 (Tenn. Ct. App. Aug. 20, 2020). The possibility of relapse outside of the restrictive environment of incarceration, an inpatient substance abuse program, or a halfway house poses a significant risk of further abuse and neglect to the Child and prevents the Child's safe return to Mother's care.

Moreover, "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). As previously discussed, at the time of trial, Mother was residing at a halfway house where the Child could not live. Mother also testified that she did not have any definite plan for housing after leaving the halfway house. Thus, without even a prospect of where she would live after leaving the halfway house, she had not provided a suitable home for the Child by the time of trial. Mother's uncertain housing situation, in all reasonable probability, would cause the Child to suffer from further abuse and neglect and therefore prevents her safe return to Mother's care.

More than two years elapsed between the removal of the Child from Mother's legal custody in September 2020 and the final hearing in April 2023. With Mother failing to demonstrate that she could achieve lasting sobriety or obtain stable housing in this significant period of time, it is unlikely that these conditions will be remedied at an early date. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii); *Dep't of Children's Servs. v. B.B.M.*,

No. E2006-01677-COA-R3-PT, 2007 WL 431251, at *9 (Tenn. Ct. App. Feb. 9, 2007) ("Given that Mother has been unable to remedy these problems for many years, it is unlikely that these conditions would be remedied at any time in the near future."). The uncertainty surrounding Mother's substance abuse issues and housing situation stand in marked contrast to the stability and care that the Child has experienced in her foster home. She has a close bond with her foster parents and foster siblings, and in her pre-adoptive foster home, she has made great progress in her development with necessary therapies and medical care. The Child deserves permanence and stability, and the continuation of her relationship with her mother greatly diminishes her chances of being part of a "safe, stable, and permanent home" during her childhood. Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). We therefore conclude that there was clear and convincing evidence supporting this ground for termination.

### 3. Abandonment by Failure to Establish a Suitable Home

Another ground for termination exists based on a parent's abandonment of his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Under Tennessee Code Annotated section 36-1-102(1)(A), there are several alternative definitions of "abandonment." *See* Tenn. Code Ann. § 36-1-102(1)(A). One alternative definition of abandonment is summarized as the failure to provide a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*). Tennessee Code Annotated section 36-1-102(1)(A)(ii) defines abandonment for this ground as the following:

> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

> (*b*) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that *the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child* to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward

- 15 -

the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added).

Here, the trial court found that DCS "made reasonable efforts" as required for this ground in subsection (*b*). However, we note that the trial court's findings as to subsection (*c*) do not focus on Mother's *efforts*. The trial court made the following findings in its termination order:

> The parents never established appropriate housing nor completed any significant services. Mother currently lives in a half-way house where children are not allowed to reside. . . . Therefore, the parents have not been able to establish appropriate housing for the child and it appears unlikely that they will be able to provide a suitable home for the child any time soon. Therefore, there are grounds to terminate the parent's rights based on their abandonment of the child by failing to establish a suitable home.

Instead of analyzing whether Mother "made reciprocal reasonable efforts to provide a suitable home" or "demonstrated a lack of concern for the child," the court's findings focus exclusively on the Mother's circumstances and the results of her efforts.

We faced a similar situation in *In re Edward C.*, 684 S.W.3d 410 (Tenn. Ct. App. 2023). In that case, the trial court found that DCS had established by clear and convincing evidence the ground of abandonment by failure to establish a suitable home, but the trial court's findings for this ground focused on "Mother's circumstances" rather than her efforts. *Id.* at 427. We stated:

> This Court has previously concluded: "A parent is only required to make 'reasonable efforts' to establish a suitable home; 'successful results' are not required." *In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *8 (Tenn. Ct. App. July 6, 2021) (quoting *In re D.P.M.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938, at *10 (Tenn. Ct. App. Sept. 8, 2006)). Here, instead of focusing on Mother's efforts or whether she had demonstrated a lack of concern for the Child, the Juvenile Court focused on whether Mother's efforts were successful. After determining that DCS had made reasonable efforts, the Juvenile Court made the following findings about Mother's current circumstances: (1) Mother has had another child since the Child's birth and given this child up for adoption, (2) Mother does not have a suitable home for the Child, (3) many hours are required each day to care for the Child, (4) transportation is required for the Child to attend various therapy appointments, and (5) Mother does not have the ability to meet the Child's needs and cannot remedy her issues in the foreseeable

- 16 -

future. Although these findings clearly demonstrate Mother does not presently have a suitable home or ability to properly care for the Child, the Juvenile Court did not provide any findings related to Mother's efforts as required as to this ground. *See In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016) ("Our review is therefore hampered by the omission of specific factual findings in the trial court's written order. . . . It is not the role of this Court to parse the record in search of clear and convincing evidence . . . to make factual findings where the trial court fails to do so.").

*Id.* Due to the trial court's failure to provide sufficient findings of fact relevant to the mother's efforts, we ultimately vacated the ground of abandonment by failure to establish a suitable home as to the mother.

Similarly, our review of this ground is limited by the court's failure to provide sufficient findings of fact concerning Mother's "reciprocal reasonable efforts" or "lack of concern" for the Child. Therefore, we vacate the order terminating Mother's parental rights with respect to this ground.

### 4. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

The final ground for termination at issue in this case is failure to manifest an ability and willingness to assume custody or financial responsibility. This ground exists when:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . .

Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs necessary to prove for this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Our supreme court has explained that the first prong "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if the petitioner "seeking to terminate parental rights proves by clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability is evaluated based

"on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at \*5 (Tenn. Ct. App. Apr. 9, 2020) (quoting *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at \*7 (Tenn. Ct. App. May 31, 2018)). A parent demonstrates willingness, on the other hand, "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* (citing *In re Ayden S.*, 2018 WL 2447044, at \*7).

As for the second prong, a court "examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of custody would present 'a risk of substantial harm to the physical or psychological welfare of the child.'" *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at \*7 (Tenn. Ct. App. Mar. 23, 2021) (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

First, we address Mother's ability and willingness to assume custody or financial responsibility for the Child. Although we recognize that Mother had not tested positive for drugs since she was released from incarceration, her issues with substance abuse remain a significant concern, and she has not demonstrated that she can achieve lasting sobriety outside of the restrictive structure of incarceration, the substance abuse treatment program, or the halfway house. Likewise, at the time of trial, Mother did not have adequate housing for the Child or any definite plans on obtaining adequate housing in the near future. Thus, her recent history of drug use and her lack of adequate housing for the Child evince a lack of ability to personally assume custody of the Child. Furthermore, Mother's lack of effort in developing definite plans to obtain suitable housing for the Child and her failure to pay child support attest to a lack of willingness to assume custody and financial responsibility for the Child.

Second, we address whether placing the Child in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. *See* Tenn. Code Ann. § 36-1-113(g)(14). We have described this element as follows:

> [T]he use of the modifier 'substantial' indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at \*6 (Tenn. Ct. App. Jan. 29, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). "[P]arents with a significant, recent history of substance abuse . . . could lead to a conclusion of a risk of substantial harm." *Id.* We have also previously found a risk of substantial harm where the parent has not obtained adequate housing. *See In re Damium F.*, No. M2021-01301-COA-R3-PT, 2022 WL 3100560, at \*10 (Tenn. Ct. App. Aug. 4, 2022) ("Given that Mother still lacks adequate housing . . . we agree with the trial court's finding that placing

- 18 -

the children with her poses a risk of substantial harm to their physical and psychological welfare."). Due to Mother's significant history of drug use and the uncertainty concerning her housing situation after she leaves the halfway house, we agree with the trial court's finding that placing the Child in Mother's custody would pose a risk of substantial harm to her physical and psychological welfare. Accordingly, we conclude that there was clear and convincing evidence supporting this ground for termination.

## B. Best Interest of the Child

We now turn to address whether the trial court erred in finding that it was in the best interest of the Child to terminate Mother's parental rights. Our supreme court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017). The twenty statutory best-interest factors are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

- 20 -

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T).

We note that the trial court's termination order stated that the court "considered the non-exclusive factors" found in Tennessee Code Annotated section 36-1-113(i), but inexplicably, the court only made findings regarding six of the twenty factors—factors (C) (concerning the parent's demonstration of continuity and stability in meeting the child's needs), (D) (concerning the attachment between the parent and child), (E) (concerning visitation between parent and child), (J) (concerning the parent's lasting adjustment of circumstances), (M) (concerning the parent's sense of urgency), and (S)

(concerning whether the parent has paid more than token child support). The court did not state that these were the most important factors in its determination or why it chose to only include an express discussion of these factors.

This court addressed a similar situation in *In re Autumn D.*, No. E2020-00560-COA-R3-PT, 2020 WL 6306056 (Tenn. Ct. App. Oct. 28, 2020). In that case, the trial court discussed only two of the nine best interest factors under a previous version of the termination statute. *Id.* at *6. Although we declined "to state that a trial court's order is deficient in every case in which the trial court fails to expressly discuss each of the nine factors," we concluded that "addressing only two of the nine factors in this particular case was insufficient." *Id.* We further noted that other factors were relevant in the case but were not addressed by the trial court. *Id.* Due to the trial court's failure to properly perform its analysis of whether termination was in the best interest of the child, we vacated the trial court's order with respect to its best interest determination and remanded "with instructions to properly consider all relevant best interest factors and detail its findings of fact and conclusions of law." *Id.* at *7.

Here, the court's decision to make express findings as to only six of the factors is difficult to understand, considering that the parties presented proof relevant to many of the other fourteen factors not directly addressed by the trial court. For instance, although these are not the only other relevant factors in this case, the court heard testimony from the foster mother that was relevant to the factors concerning the Child's need for stability and the effect that termination would have on her well-being and relationships. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning a child's need for stability); (B) (concerning how a change in caretaker would affect a child's well-being), (H) (concerning the child's parental attachment with individuals other than the parent), and (I) (concerning the child's relationship with others). The court's failure to expressly discuss these factors and all other relevant factors limits our ability to conduct appropriate appellate review of the trial court's determination that termination was in the best interest of the child.[10] *See In re Autumn D.*, 2020 WL 6306056, at *7; *see also In re Zoey L.*, No. E2019-01702-COA-R3-PT, 2020 WL 2950549, at *1 (Tenn. Ct. App. June 3, 2020) (quoting Tenn. Code Ann. § 36-1-113(k)) (citing Tenn. R. Civ. P. 52.01) ("To enable appellate review, the trial court must make 'specific findings of fact and conclusions of law' when entering an order in a termination of parental rights proceeding."). As our Supreme Court has explained,

> "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*,

---

[10] While we have not required trial courts to make express findings as to every best interest factor, we note that "the better and safer practice for trial courts, in order to avoid undue delay and remand, is to make findings for each best interest factor, whether it weighs in favor of termination, against termination, or is neutral." *In re Danielle V.*, No. W2023-01023-COA-R3-PT, 2024 WL 342518, at *11 n.9 (Tenn. Ct. App. Jan. 30, 2024).

171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d at 682. Thus, we conclude that the trial court failed to properly perform its best interest analysis. Accordingly, we vacate the trial court's order with respect to its best interest determination and remand with instructions to consider all of the relevant best interest factors and detail its findings.

## V. CONCLUSION

For the aforementioned reasons, we conclude as follows: (1) we reverse the trial court's finding that the ground of abandonment by an incarcerated parent was established as to Mother; (2) we affirm the court's findings that the grounds of substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility were established as to Mother; (3) we vacate the court's finding that ground of abandonment by failure to establish a suitable home was established as to Mother; and (4) we vacate the court's finding that termination of Mother's parental rights was in the best interest of the Child and remand with instructions to consider all of the relevant best interest factors and detail its findings. Costs of this appeal are taxed equally between the parties, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE